UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff ) | |
| ) | No. 1:04-CR-160-02 |
| v. ) | |
| ) | Chief Judge Curtis L. Collier |
| SIR JACK MATTHEWS, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM**

Before the Court is Defendant Sir Jack Matthews' ("Defendant" or "Matthews") motion to withdraw his guilty plea (Court File No. 766). Matthews also submitted supplemental material (Court File No. 824). The United States filed a response in opposition (Court File No. 795). For the following reasons, the Court does not find a fair and just reason to grant Defendant's motion, and will therefore **DENY** Defendant's motion (Court File No. 766) and reset this case for sentencing in the accompanying Order.

**I.    RELEVANT FACTS**

Matthews was involved in a very serious course of action that led to the shooting death of kidnapping/carjacking victim Guy Luck. Following his arrest Defendant entered a guilty plea under oath before this Court.

**A.    Facts in Defendant's Plea Agreement**

According to facts included in Defendant's plea agreement[1] (Court File No. 283), he went to the home of Guy Luck in Atlanta, Georgia, on August 6, 2003. Matthews was accompanied by codefendants Rejon Taylor ("Taylor") and Joey Montrez Marshall ("Marshall"). The three codefendants were familiar with Luck's residence, as they had previously burglarized it on multiple occasions and stolen personal and financial information from Luck. On this occasion, unlike in previous burglaries, the codefendants did not bring gloves or burglary tools. Instead, they brought guns.

The armed codefendants confronted Luck outside his house and forced him into the back of his van, where Matthews guarded him with a loaded 9mm semi-automatic pistol. After stealing things inside the house, Taylor got into the van's driver seat and drove away from Luck's residence while Marshall followed behind in a car registered to Taylor's mother. The van and car drove north, traveling from Georgia into Tennessee. Matthews continued guarding Luck in the back of the van, which also contained numerous supplies for the restaurant Luck owned and operated.

Taylor turned the van onto an isolated road in Collegedale, Tennessee, and began slowing down. In desperation, Luck attempted to overpower Matthews, who fired a round from the pistol into Luck, hitting him in the right arm. Taylor, who had a .38 caliber revolver, turned around from the driver's seat and fired multiple rounds into Luck. One round passed through Luck and hit Matthews. This round was recovered from inside Matthews and matched to the revolver later found at the scene. Another round went through Luck's head and mouth. This round was also matched to the revolver.

---

[1] Defendant was asked whether these facts were true and correct. Under oath Defendant told the Court they were true and correct.

2

A witness approached the van and saw Luck trying to get out. Luck stated he had been robbed and shot and he then collapsed to the ground. He was transported to a hospital where he died. Marshall drove Matthews and Taylor back towards Atlanta, where the codefendants split cash they had stolen from Luck and left Matthews at a hospital to be treated for his gunshot wound. Marshall and Taylor used the stolen cash on a dinner date with their girlfriends.

Law enforcement officers found the .38 caliber revolver and 9mm semi-automatic pistol in the van. DNA analysis of blood in the van showed the blood belonged to Matthews and Luck. A bloody palm print was identified as belonging to Taylor.

### B. Procedural History

Matthews, Taylor, and Marshall were arrested after Luck's murder. They were indicted by a federal grand jury on October 13, 2004, and charged with four capital offenses: carjacking resulting in death, in violation of 18 U.S.C. § 2119(3); murder by use of a firearm during and in relation to carjacking, in violation of 18 U.S.C. § 924(j)(1); kidnapping resulting in death, in violation of 18 U.S.C. § 1201(a)(1); and murder by use of a firearm during and in relation to kidnapping, in violation of 18 U.S.C. § 924(j)(1). The grand jury also made sentencing allegations in contemplation of the death penalty (Court File No. 1).

Matthews appeared before a United States Magistrate Judge on October 26, 2004 and was appointed counsel (Court File No. 5). He was arraigned on November 3, 2004, and the magistrate judge entered a not guilty plea on behalf of Matthews (Court File No. 29).

Two years later, around November 2, 2006, Matthews indicated he intended to plead guilty. The Court held a rearraignment, or change of plea hearing, on November 16, 2006 (Court File No. 282). Matthews was represented by attorney Jerry H. Summers, one of the pre-eminent criminal

3

defense attorneys in this area, and one of Mr. Summers' associates, Marya Schalk. At the change of plea hearing Matthews entered guilty pleas to all four counts pursuant to a plea agreement (Court File No. 283). At the same time, Marshall also pleaded guilty to all four counts pursuant to a plea agreement, which contained essentially the same factual basis as Matthews' agreement.

Earlier that year, on June 1, 2006, the government had filed a notice of intent to seek the death penalty against Taylor (Court File No. 123). Taylor's case proceeded to trial on August 25, 2008. Taylor's jury convicted him of all four counts and then reconvened for a sentencing phase, pursuant to the Federal Death Penalty Act of 1994, 18 U.S.C. §§ 3591-3598. At the conclusion of the sentencing proceeding, the jury returned a verdict of death for Taylor. The Court later imposed that death sentence.

During the guilt-innocence phase of Taylor's trial, the government called Marshall and Matthews as witnesses. Marshall testified consistently with the facts contained in his plea agreement. Matthews did not.

### C. Matthews' Testimony

Matthews accused the prosecutors and lead FBI agent of telling him how to testify. Matthews stated his past admissions had not been truthful. He wavered on whether his decision to plead guilty was truly his decision and explained his "mind wasn't clear when I did it" because the possibility of a death sentence "clouded my judgment." He blamed the plea on his attorney, who he said did not review the case with him and did not "see what grounds I had for a defense." The attorney only visited Matthews when it came time to enter a plea, Matthews testified. Matthews said he is not guilty. He acknowledged making contradictory statements at his rearraignment.

Matthews then gave his new account of the events on August 6, 2003:

4

Taylor and Marshall needed Matthews' help to move "some stuff" for a friend of Taylor's. The trio went to Luck's house, where they helped Luck move the stuff into Luck's van. Marshall then brought a trash bag with two pounds of marijuana in it, which they put in the back of the car Marshall was driving. Marshall and Matthews drove around the neighborhood while Taylor talked with Luck. A few minutes later, Taylor called Marshall and they met up on the highway. They later stopped at a gas station. Marshall and Matthews waited at the gas station for 15 or 20 minutes while Taylor and Luck went to meet someone. Taylor and Luck returned with about $9000 from the person they were meeting. Then, they all went to Tennessee, to a house where Taylor had been with Luck once before. At the house, they dropped off some boxes.

When they left the house, Matthews stepped into the van with Taylor and Luck, while Marshall continued to drive the car. In the van, Matthews recounted a conversation about Luck's sexual activities, which concluded with Matthews referring to pictures of naked children Luck supposedly possessed. Based on this statement, Luck supposedly knew Matthews had burglarized his house, and Luck threatened to kill Matthews and Taylor. Luck reached for his gun and Matthews reached for his. The van jerked, and the two men began fighting and Matthews shot Luck in the arm. Luck kept fighting and Matthews hit him in the head with the gun. Then Matthews got shot. Although Matthews first thought he was shot by Luck, he then realized Taylor had shot him. Luck's phone started ringing. Matthews grabbed the phone, left the van, and ran to the car being driven by Marshall. Taylor followed right behind him. The trio drove back to Atlanta, split up the money, and washed up.

Matthews' new story was the subject of extensive impeachment by the government. Matthews acknowledged writing a letter shortly after his arrest in which he implied the trio had

5

come across Luck and jumped on him. He also acknowledged telling different accounts to a police detective and FBI agent. The government also played a video of an earlier inconsistent statement Matthews made to a police detective.

Matthews testified he and Marshall decided they would not talk about Luck's death. But if need be, they would say they robbed Luck and blame the murder on Taylor. Matthews later testified Marshall's and Taylor's connection to the victim was based on a sexual relationship. Matthews said he made up his original account because Marshall did not want his supposed sexual affair with Luck "to get out." So, Matthews testified, he "agreed with [Marshall] to tell the little story, the little lie about the robbery." In response to a question asking whether Matthews and Marshall made up a story to blame Taylor, Defendant answered: "Right, because by us not just really knowing about how the law works like that, we figure we would just get a simple robbery charge, and he would be stuck with the murder, and we would do a few and get out and then -- so I just went with it."

Matthews explained he would rather be truthful and serve a life sentence than testify falsely and cause Taylor to receive a death sentence. He said Taylor had confused Luck's gun for his and Taylor threw away Luck's gun into the woods. Matthews also elaborated on the pictures of nude children, which he and Marshall supposedly found, along with seven or eight thousand dollars in cash, in a lockbox in Luck's house. Asked what happened to the lockbox and the photographs, Matthews said "we destroyed everything." Matthews also clarified they were helping Luck deliver something and Luck voluntarily crossed state lines; he was not taken at gunpoint. Neither he nor Taylor intended to kill Luck, Matthews claimed.

After Matthews testified, his counsel moved to withdraw due to a conflict of interest (Court File No. 657). That motion was granted and Matthews was appointed new counsel (Court File No.

6

757), who filed the instant motion.

## II. DISCUSSION

Defendant moves to withdraw his guilty plea.[2] The Court accepted his plea at the conclusion of his change of plea hearing. Sentencing has not yet occurred, so Defendant can withdraw his guilty plea only if Defendant "can show a fair and just reason for requesting the withdrawal." Fed. R. Crim. P. 11(d); *see also United States v. Ellis*, 470 F.3d 275, 280 (6th Cir. 2006) ("A defendant does not have an absolute right to withdraw a guilty plea and bears the burden of proving that he is entitled to withdraw his guilty plea.").

This rule is designed "to allow a hastily entered plea made with unsure heart and confused mind to be undone, not to allow a defendant to make a tactical decision to enter a plea, wait several weeks, and then obtain a withdrawal if he believes he made a bad choice in pleading guilty." *Ellis*, 470 F.3d at 280-81 (quoting *United States v. Alexander,* 948 F.2d 1002, 1004 (6th Cir. 1991)). "When a defendant has entered a knowing and voluntary plea of guilty at a hearing at which he acknowledged committing the crime, the occasion for setting aside a guilty plea should seldom arise." *Id.* at 280.

The Court considers seven factors in determining whether a defendant meets his burden:

(1) the amount of time that elapsed between the plea and the motion to withdraw it; (2) the presence (or absence) of a valid reason for the failure to move for withdrawal earlier in the proceedings; (3) whether the defendant has asserted or maintained his innocence; (4) the circumstances underlying the entry of the guilty plea; (5) the defendant's nature and background; (6) the degree to which the defendant has had

---

[2]Defendant also requests a hearing. Defendant is not entitled to an evidentiary hearing as a matter of right, *United States v. Woods*, 554 F.3d 611, 613 (6th Cir. 2009), and the Court concludes a hearing is unnecessary.

7

prior experience with the criminal justice system; and (7) potential prejudice to the government if the motion to withdraw is granted.

*Id.* at 281; *United States v. Bashara*, 27 F.3d 1174, 1181 (6th Cir. 1994). "The factors listed are a general, non-exclusive list and no one factor is controlling." *Ellis*, 470 F.3d at 281 (quoting *United States v. Bazzi*, 94 F.3d 1025, 1027 (6th Cir. 1996)).

The Court will consider each factor in turn:

*1.      Amount of Time Between Plea and Motion to Withdraw*

Defendant pleaded guilty in November 2006 and moved to withdraw his plea in November 2008, a full two years later. Defendant represents he sent letters to his then-counsel starting in April 2008 seeking to withdraw his plea. In considering this factor, the relevant time period is the length between the plea and "the motion to withdraw it," *Ellis*, 470 F.3d at 281. The time period is not based on when Defendant first thought about withdrawing his plea or first notified his attorney of a desire to withdraw it. *See Bashara*, 27 F.3d at 1181 (analyzing delay where defendant regretted his plea eleven days after entering it but did not file motion to withdraw until six weeks had passed). Nevertheless, even if Defendant's representations about when he first contacted his attorney to withdraw his plea are true, then it was still a full 17 months between Defendant's guilty plea and his first expression of a desire to withdraw his plea. This is a substantial length of time.

"The shorter the delay, the more likely a motion to withdraw will be granted, and a defendant's reasons for filing such a motion will be more closely scrutinized when he has delayed his motion for a substantial length of time." *United States v. Dixon*, 479 F.3d 431, 436 (6th Cir. 2007) (quoting *United States v. Baez*, 87 F.3d 805, 808 (6th Cir. 1996)); *Ellis*, 470 F.3d at 281. In *Dixon*, 479 F.3d at 436, a delay of 23 months "weigh[ed] heavily" against allowing withdrawal because the Sixth Circuit has "frequently relied on much shorter delays for upholding a withdrawal

8

denial." *Id.* For instance, the delay in *Ellis* was six months, a time lapse that also "weigh[ed] heavily" against withdrawal. 470 F.3d at 282. *Ellis* cited a number of Sixth Circuit decisions denying motions to withdraw with time lapses of under six months: *United States v. Pluta*, 144 F.3d 968, 973 (6th Cir. 1998) (four month delay); *United States v. Valdez*, 362 F.3d 903, 912 (6th Cir. 2004) ("unjustified 75-day delay, alone, supported the court's denial of a motion to withdraw"); *United States v. Durham*, 178 F.3d 796, 798-99 (6th Cir. 1999) (seventy-seven day delay was strongest factor supporting denial motion to withdraw); *Baez*, 87 F.3d at 808 (sixty-seven day delay); *United States v. Goldberg*, 862 F.2d 101, 104 (6th Cir. 1988) (fifty-five day delay); *United States v. Spencer*, 836 F.2d 236, 239 (6th Cir. 1987) (five week delay). *See also United States v. Haygood*, 549 F.3d 1049, 1053 (6th Cir. 2008) (delay of four and one-half months "weighs heavily against" defendant); *Alexander*, 948 F.2d at 1004 (Defendant's "delay of almost five months is certainly beyond the bounds of the time frame ordinarily considered appropriate for motions to" withdraw a plea.). Based on ample precedent, the delay here—whether 17 months or 24 months—weighs heavily against Defendant.

      *2.      Existence of Valid Reason for the Not Moving to Withdraw Earlier*

Defendant acknowledges the length of the delay in moving to withdraw but contends it is justified. *E.g.*, *United States v. Osborne*, 565 F.Supp. 2d 927 (E.D. Tenn. 2008) (allowing withdrawal of plea despite passage of 133 days because delay was justified). Defendant submits three reasons to justify the delay. First, he contends he was under constant pressure from his family to plead guilty to avoid the death penalty; he delayed withdrawing his plea because he did not want to face the death penalty and put his family through a death penalty prosecution. Second, Defendant was incarcerated in the Hamilton County Jail in the same cell as Taylor since September 2007. He

9

saw the effects of a capital prosecution on his close friend and knew withdrawing his guilty plea would subject him to a capital prosecution too. Third, Defendant did not know he could withdraw his plea. Once he learned of the possibility, he contacted his attorney and requested to withdraw the plea. The government argues Defendant's justification is inadequate.

The Court finds Defendant's proffered justifications do not explain why he waited either 17 or 24 months. Until this motion, Defendant has never attributed his decision to plead guilty to his family. Many defendants face pressure based on the risks often associated with proceeding to trial. The risk here in the form of a potential death sentence was greater but not so different that it should have overwhelmed Defendant's ability to rationally choose to plead guilty or proceed to trial. During the two years between Defendant's initial arraignment and his decision to plead guilty, he had more than enough time to make a wise choice. Further, his justification does not explain why Defendant would have perjured himself at his change of plea hearing.

As for Defendant's contention that he did not know he could withdraw his guilty plea earlier, the Court does not find this explanation plausible. The Court made two separate references at Defendant's rearraignment to the possibility of withdrawing a plea. The Court stated that if Defendant's plea agreement is rejected, he will have an opportunity to withdraw from his guilty plea. The Court also stated that even if Defendant later learns his sentence is greater than he expected, he will not have a right to withdraw from his plea. Defendant acknowledged he understood both statements. Although neither mention of withdrawal concerns the circumstances present here, both references to plea withdrawal should have indicated to Defendant the concept of a defendant withdrawing his plea.

    *3.*      *Defendant's Assertion of Innocence*

Defendant argues he has asserted his innocence through his sworn testimony at Taylor's trial. But the government points out Defendant did not assert his innocence at the time of his guilty plea or in his previous confessions to law enforcement. Thus, Defendant has not made "vigorous and repeated protestations of innocence." *Alexander*, 948 F.2d at 1004. Furthermore, Defendant's assertion of innocence is undermined by multiple facts.

First, Defendant never asserted his innocence or expressed any sort of reservation about pleading guilty during his rearraignment or at any time until his testimony during Taylor's trial. At the rearraignment, Defendant under oath agreed with the factual basis contained in the plea agreement, with some minor changes which he initialed, thus further demonstrating his comprehension and concurrence with the facts supporting his guilt. Not once during the rearraignment did Defendant express reservations or hesitate in pleading guilty.

Second, in his testimony at Taylor's trial, Defendant admitted to key facts: he was in Luck's van with Luck and Taylor; Defendant shot Luck; and then Taylor shot Luck, also hitting Defendant once. He admits being involved in killing Luck but denies having carjacked or kidnapped Luck.

Third, Defendant's contention Luck was neither carjacked nor kidnapped is inconsistent with his prior statements. His testimony was contradicted by a letter he wrote shortly after his arrest. His testimony was also contradicted by his statements to the police and the FBI. His testimony was further contradicted by his plea agreement. In addition to containing facts supporting Defendant's guilt, the plea agreement contains an admission by Defendant that he made a knowing and voluntary confession to law enforcement regarding the "carjacking/kidnapping/murder" of Luck.

Fourth, in addition to being contradicted by prior statements, many of Defendant's assertions about Luck were fanciful and unsupported or contradicted by other evidence. There was nothing

11

to corroborate Defendant's claims the victim was involved in marijuana trafficking, possessed child pornography, had a sexual relationship with Taylor and Marshall, and had a gun on the day he was killed. The jury's verdict convicting Taylor makes clear the jury rejected Defendant's trial testimony. If the jury had believed Defendant's contention that Luck voluntarily accompanied Defendant and Taylor, or if the testimony had created reasonable doubt, the jury could not have convicted Taylor of carjacking or kidnapping or the associated firearms murder charges.

Fifth, Defendant explained why his previous confessions were false, but his explanation is farcical. Defendant testified he thought he could pin Luck's murder on Taylor and he would be charged only with robbery. He also claims to have accepted the robbery charge because it would prevent people from knowing of Marshall's purported homosexuality. Thus, by Defendant's account, he falsely blamed Taylor for murder and subjected himself to a robbery charge, all to prevent Marshall from being outed as a homosexual. But the folly does not end there. When Defendant was indicted, and surely by the time he pleaded guilty two years later, Defendant knew he was being held criminally responsible for murder, not just robbery. But, according to Defendant, he pleaded guilty to murder and continued to blame Taylor for murder, all in the name of hiding Marshall's purported homosexuality. Moreover, from the testimony and other evidence adduced at Taylor's trial, it is clear Taylor and Defendant were close friends but Defendant and Marshall were not close friends. Yet, Defendant's explanation is he conspired with someone he was not close to in order to condemn his close friend. Defendant's explanation is too far fetched to be credible.

Sixth, the real motivation for Defendant's testimony is apparent from communications between Defendant and Taylor and outsiders. Defendant and Taylor were inexplicably housed together at the Hamilton County Jail. In a letter Taylor wrote shortly after his guilty verdict, Taylor

12

stated Defendant knows Taylor should have won his case and the conviction will be reversed on appeal. At the beginning of the trial, Defendant made a phone call in which he stated he would be testifying on Taylor's behalf. Defendant explained that Taylor would win his federal case and then both Defendant and Taylor would be prosecuted together by the state. The day before Defendant's testimony in Taylor's trial, Taylor made a phone call in which he said tomorrow would be the big day and everything would be cleared up. These communications show Defendant's motivation to testify differently than his prior statements.

*4.      Circumstances Underlying Entry of the Plea*

Defendant argues his plea was not knowing, voluntary, and intelligent because family pressure to avoid a death sentence prevented him from thinking clearly. He also blames his then-counsel for not discussing the case with him and leading him to believe he had no choice but to sign the plea agreement.

Defendant's assertions conflict with his statements at the change of plea hearing. *See United States v. Hess*, 978 F.2d 1260 (Table), 1992 WL 322381 at *5 (6th Cir. Nov. 5, 1992) ("A defendant's statements at a plea hearing 'should be regarded as conclusive [as to truth and accuracy] in the absence of a believable, valid reason justifying a departure from the apparent truth' of those statements.") (quoting *United States v. Estrada*, 849 F.2d 1304, 1306 (10th Cir.1988) (alteration in original)). Under oath at his rearraignment, Defendant said he understood the charges in the indictment. He said he had enough time to discuss his case with his attorney and was satisfied with his attorney's representation. His attorney said he considered Defendant competent to enter a plea of guilty. The Court recited a list of rights Defendant was waiving, and Defendant said he understood he was giving up those rights. He said he understood there would not be a trial.

13

Defendant stated no one had forced him or pressured him into pleading guilty. After each count of the indictment was read, Defendant said he was guilty, and no reservation was apparent. When asked whether he was pleading guilty because he was in fact guilty, Defendant said he was. At the conclusion of the hearing, the Court found Defendant's plea was knowing and voluntary. The circumstances of the entry of Defendant's guilty plea are similar to *Ellis*, 470 F.3d at 285, and weigh against allowing Defendant to withdraw his plea. *See also Spencer*, 836 F.2d at 239 (admission of guilt in open court weighs against withdrawal).

   5.   *Defendant's Nature and Background*

Defendant contends he lacks the necessary intelligence, sophistication, and basic understanding of his plea agreement, the charges against him, and the effect of his plea agreement on his potential sentence. Defendant notes he was 19 when he was arrested in connection with this offense. He is a high-school dropout whose grades were mostly Fs. His work experience is apparently limited to about three years of bagging groceries and cleaning at a grocery store. Defendant contrasts his case with *Ellis*, where the Sixth Circuit held this factor weighs against a highly educated and sophisticated defendant. 470 F.3d at 285. But, the government argues, Defendant's academic record notwithstanding, he has demonstrated his savvy by attempting to help Taylor escape conviction and planning to then get prosecuted in state court.

While Defendant may have developed some sophistication regarding the criminal justice system during his time in prison, at the time of entry of the guilty plea, it appears he was a fairly uneducated, unsophisticated person. However, aside from his mediocre grades, there is no indication Defendant had trouble comprehending his plea agreement and the charges against him or was incapable or incompetent to enter a plea. *See United States v. Chapa*, 1999 WL 1253088,

14

1999 U.S. App. LEXIS 34066 at *10 (6th Cir. Dec. 17, 1999). Thus, while this factor weighs in favor of Defendant, its strength is limited.

   6.   *Defendant's Prior Experience With the Criminal Justice System*

"The Court should determine under this factor whether defendant is 'a novice' to or 'familiar with' the criminal justice system." *Osborne*, 565 F. Supp. 2d at 938 (citing *Spencer*, 836 F.2d at 240). Defendant argues this factor weighs in his favor because he has no prior convictions. The government does not specifically address this argument, other than contending Defendant's attempts to game the system in connection with Taylor's trial demonstrate sophistication. But this factor considers Defendant's *prior* experience with the criminal justice system, not his experience after the plea.

At Taylor's trial, there was evidence Defendant had been arrested in Georgia for statutory rape and sexual molestation of a child, but those charges were dropped upon his extradition to Tennessee to face charges for Luck's murder. There is no indication he has ever been convicted of a crime. *Cf. Dixon*, 479 F.3d at 437 (prior conviction weighs factor against defendant); *Ellis*, 470 F.3d at 285 n.3 (conviction for minor offense does not indicate extensive experience with criminal justice system); *Durham*, 178 F.3d at 799 (bank robbery conviction indicates defendant has experience with criminal justice system). Defendant's lack of prior convictions shows his inexperience with the criminal justice system prior to his guilty plea and weighs in favor of him. However, the lack of prior experience is not by itself sufficient to support withdrawing Defendant's plea. *United States v. Fofana*, 50 F. App'x 725, 730 (6th Cir. 2002).

   7.   *Potential Prejudice to the Government if the Motion is Granted*

The "government is not required to establish prejudice that would result from a plea

15

withdrawal, unless and until the defendant advances and establishes a fair and just reason for allowing the withdrawal." *Ellis*, 470 F.3d at 286 (quoting *Spencer*, 836 F.2d at 240). Although the Court concludes Defendant has not established a fair and just reason for allowing the withdrawal, the Court notes prejudice would occur to the government because it has already tried Taylor and would be forced to prepare for and conduct another lengthy trial with largely the same witnesses and exhibits. Requiring the government to conduct another trial would "work a substantial hardship and prejudice to the government." *Hess*, 1992 WL 322381 at *5.

### III. CONCLUSION

Having considered the factors in light of the ultimate question—whether Defendant "can show a fair and just reason for requesting the withdrawal," Fed. R. Crim. P. 11(d)—the Court concludes withdrawal is not appropriate. The lengthy delay is unjustified and militates strongly against withdrawal. Defendant's belated assertion of innocence is contradicted by his multiple prior admissions and is not worthy of credence. At his rearraignment, Defendant pleaded guilty and admitted the facts of his guilt without reservation and under circumstances indicating his plea was knowing and voluntary. These factors outweigh Defendant's lack of prior convictions and his relative lack sophistication and formal education. *Cf. United States v. Murray*, 66 F. App'x 600, 605 (6th Cir. 2003) (concluding a defendant's nature and background and lack of prior experience with the criminal justice system weighed in favor of the defendant but did not outweigh the countervailing factors as a whole).

The factors show Defendant is guilty, he made a knowing and voluntary decision to plead guilty, and he waited far too long to seek to withdraw his guilty plea. Accordingly, he has not

16

shown a fair and just reason for withdrawing his plea, and his motion to withdraw will be **DENIED**.

An Order shall enter.

                                       **/s/**
                                       **CURTIS L. COLLIER**
                                       **CHIEF UNITED STATES DISTRICT JUDGE**

17

Case 1:04-cr-00160-CLC-CHS   Document 832   Filed 03/26/09   Page 17 of 17   PageID #: 2837